# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0216-19

I.M.R.,[1]

     Plaintiff-Respondent,

v.

A.R.S.,

     Defendant-Appellant.

_____

          Submitted November 5, 2020 – Decided October 13, 2021

          Before Judges Fuentes and Whipple.

          On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-0228-20.

          Law Offices of Jonathan F. Marshall, attorney for appellant (Jeff Thakker, of counsel; Jason Seidman, on the brief).

          Respondent has not filed a brief.

    The opinion of the court was delivered by

---

[1] Because this appeal involves allegations of domestic violence, we use initials to identify the parties pursuant to Rule 1:38-3(d)(9) and (10).

FUENTES, P.J.A.D.

Defendant A.R.S. appeals from a final restraining order (FRO) issued by the Family Part on August 5, 2019, under the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to -35, in response to a complaint filed by plaintiff I.M.R. and a subsequent temporary restraining order (TRO) issued by the Woodbridge Township municipal court ex parte on July 21, 2019.

Defendant argues, inter alia, that the Family Part judge who conducted the FRO hearing (1) failed to make specific findings that defendant committed the predicate offense of criminal mischief and (2) did not find an FRO was necessary to protect plaintiff from future acts or threats of domestic violence by defendant, pursuant to the two-prong analytical paradigm this court established in Silver v. Silver, 387 N.J. Super. 112, 125-27 (App. Div. 2006), which was subsequently adopted by the Supreme Court in J.D. v. M.D.F., 207 N.J. 458, 488 (2011). We agree with defendant's arguments and reverse. We also hold the hearing conducted by the Family Part judge did not adhere to basic adjudicative principles of sound courtroom management.

Plaintiff alleged

> [o]n July 21, 2019, around 2:00 a.m. [he] woke up and [saw] his car had been egged. There was also writing on his car with mustard that said "suck it" (penis drawing on vehicle). Plaintiff stated he contacted his

2

> ex-girlfriend via Facebook asking her why she egged his car. The defendant stated we did not do it. The plaintiff asked her who she did it with but she did not tell him. The defendant stated that she was with the people who did it but did not provide the names of who did it.

The PDVA complaint checked criminal mischief and harassment as the two predicate acts of domestic violence plaintiff's former romantic partner committed against him. N.J.S.A. 2C:25-19(a)(10) (13). The parties' prior relationship gave the municipal court jurisdiction to consider plaintiff's account of events ex parte and issue the TRO.

The Family Part judge conducted the FRO hearing on August 5, 2019. Both parties appeared before the court pro se. The judge gave a brief recitation of the nature of the hearing and told defendant she had the right to be represented by counsel, but he could not appoint an attorney to represent her. Defendant said she was "ready to proceed." The judge conducted the proceeding by asking the parties direct questions.

Plaintiff testified his romantic relationship with defendant ended in 2015. On July 21, 2019, plaintiff testified he "woke up" at around two o'clock in the morning saw that his car had been "egged" and immediately "suspected it was [defendant]." When the judge asked why he suspected defendant, plaintiff responded: "She's pretty much the only person that I know . . . that . . . knows

3

my . . . house and knows my car before my girlfriend now . . . ." The judge asked plaintiff whether he had any recent communication with defendant prior to this incident. Plaintiff testified he contacted defendant "about two months prior" because he wanted to "try and become friends again, [and] see how she was doing."

The judge then refocused plaintiff's testimony to the July 21, 2019 incident and confirmed plaintiff did not see who egged his car. This prompted the following testimony:

> PLAINTIFF: So I messaged her and asked her if she -- you know, I told her that I thought it was her and --
>
> THE COURT: Did she admit to doing it?
>
> PLAINTIFF: Yes.
>
> THE COURT: What did she say?
>
> PLAINTIFF: She said that she was in the car, that she wasn't the one doing the -- the act.
>
> THE COURT: That she was in the car?
>
> PLAINTIFF: Yes and that it was her -- there was other people that were in the car that did it.

At the judge's request, plaintiff gave the court his cell phone, allegedly containing the messages. Without attempting to ascertain the authenticity of the messages, the judge addressed defendant, while in the midst of plaintiff's direct

4

testimony, and asked her: "Did you send him a text message about it[?]" Defendant answered: "Yes, Your Honor." The judge then proceeded to read into the record the content of this electronic conversation initiated by plaintiff. In his recitation, the judge did not distinguish between the parties. Several times while reading this exchange, the judge asked the parties to interpret the meaning of certain words and abbreviations. Because defendant did not include a printout of this electronic conversation in her appendix, we are left only with the inscrutable exchange reflected in the trial transcript.

The only other exhibits plaintiff attempted to introduce as evidence were photographs allegedly depicting the condition of his car on July 21, 2019.

> THE COURT: What else other than the text messages?
>
> . . . .
>
> PLAINTIFF: I have pictures of the car if you're interested in looking at it.
>
> THE COURT: I'll look at the pictures of the car in a moment. [Addressing defendant:] Let me hear your version of the events.

The court did not admit these photographs into evidence nor describe the condition of the vehicle when he placed his findings on the record at the conclusion of the FRO hearing.

Defendant acknowledged receiving a message from plaintiff about two months before the incident but denied he made any overture of friendship. She also characterized plaintiff's efforts to contact her about an unrelated car accident as "weird" because "he doesn't have me on any social media." Defendant also claimed plaintiff had contacted her several times and made a number disparaging comments about her. In response to the judge's questions about the July 21, 2019 incident, defendant denied vandalizing plaintiff's car but claimed she knew who did.

According to defendant, on the night of the incident, she had gone out with a friend. While drinking alcoholic beverages, they talked about their prior romantic relationships, including defendant's relationship with plaintiff. Her friend was particularly upset about how her recent relationship ended. At some point, they decided to take an Uber to plaintiff's house. Although defendant did not remember plaintiff's address, she guided the driver in the direction of his house where they found his car. Defendant testified that, without any prompting, her friend said "let's get out of the car and let's throw some eggs at his car." Defendant testified she believed her friend "had a lot anger due to her [former] boyfriend."

At this point, the judge asked defendant:

A-0216-19

THE COURT: Okay, so you want to put it all on her?

DEFENDANT: Most of it is on her.

. . . .

THE COURT: All right, I've heard enough.

Based on this testimonial record, the judge made the following findings:

> Defendant would like the [c]ourt to believe that she had nothing to do with it other than finding the home, and the other person got out of the car and egged the car and scratched the car, et cetera.
>
> Well it doesn't work that way, young lady. You would have never got there but for you telling where the address is. Whether it was you or a person who was doing it on their behalf this is would have never -- no -- un un this is not time for an exchange. <u>You should have never been there</u>. And the other person, according to you, doesn't even know the plaintiff.
>
> So, this is all your fault, you should have never went there, despite of what he may or may not have said to you, this is ridiculous. You two drink, you get upset, you start talking about exes and you decide well let's go take out a little revenge. Whether she threw the egg, you threw the egg, it doesn't matter, you caused all of this go into motion.
>
> <u>And then I'm reading the text messages, and quite frankly the text messages . . . you inculpate yourself by saying oh I'll pay for it, et cetera. This is all because you did something silly</u>.
>
> The [c]ourt finds that the predicated act of criminal mischief has been established based on the testimony

7

of the plaintiff -- strike that -- <u>of the defendant as well as the text messages which shows that she inculpated herself by suggesting she was there</u>. But what the [c]ourt is concerned about is she doesn't take responsibility; she wants to blame the girlfriend as opposed to blaming herself.

[(emphases added).]

Our scope of review of a Family Part judge's findings of fact in a bench trial is a narrow one. <u>Cesare v. Cesare</u>, 154 N.J. 394, 411-12 (1998). When we review an FRO issued by the Family Part in a domestic violence matter, we are bound to defer to the trial judge's findings of fact and the legal conclusions that are supported by competent evidence. <u>D.N. v. K.M.</u>, 429 N.J. Super. 592, 596 (App. Div. 2013). Stated differently, we will not "'engage in an independent assessment of the evidence as if [we] were the court of first instance.'" <u>Div. of Youth & Fam. Servs. v. Z.P.R.</u>, 351 N.J. Super. 427, 433 (App. Div. 2002) (alteration in original) (quoting <u>State v. Locurto</u>, 157 N.J. 463, 471 (1999)). However, we are also compelled to reverse a trial court's decision when our review reveals an absence of competent evidence to support the factual findings, or a misunderstanding or misapplication of the relevant legal principles. <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995).

In his PDVA complaint, plaintiff claimed defendant committed two specific predicate acts of domestic violence: harassment, N.J.S.A. 2C:33-4, and

criminal mischief, N.J.S.A. 2C:17-3. The judge did not address the harassment charge in his findings and issued the FRO based only on testimonial evidence related to the predicate act of criminal mischief. Our scope of review will therefore be limited accordingly. N.J.S.A. 2C:17-3 defines this offense as follows:

> A person is guilty of criminal mischief if he [or she]:
>
> (1) Purposely or knowingly damages tangible property of another or damages tangible property of another recklessly or negligently in the employment of fire, explosives or other dangerous means listed in subsection a. of N.J.S.2C:17-2; or
>
> (2) Purposely, knowingly or recklessly tampers with tangible property of another so as to endanger person or property, including the damaging or destroying of a rental premises by a tenant in retaliation for institution of eviction proceedings.

The record shows the Family Part judge found defendant committed the predicate act of criminal mischief based on her friend's act of throwing eggs at plaintiff's car. In the judge's own words: "Whether she threw the egg, you threw the egg, it doesn't matter, you caused all of this go into motion." (emphasis added). The judge's decision to hold defendant culpable of committing the predicate act of criminal mischief based only on her decision to drive by

plaintiff's residence and thereafter witness her friend throw eggs at plaintiff's car is incorrect as a matter of law.

It is a well-settled principle of criminal law that a person's "mere presence" at the scene of a crime is insufficient to establish culpability. The Model Jury Charge approved by the Supreme Court on accomplice liability under N.J.S.A. 2C:2-6 provides, in relevant part:

> Mere presence at or near the scene does not make one a participant in the crime, nor does the failure of a spectator to interfere make him/her a participant in the crime. It is, however, a circumstance to be considered with the other evidence in determining whether he/she was present as an accomplice. Presence is not in itself conclusive evidence of that fact. Whether presence has any probative value depends upon the total circumstances. <u>To constitute guilt there must exist a community of purpose and actual participation in the crime committed</u>.
>
> While mere presence at the scene of the perpetration of a crime does not render a person a participant in it, proof that one is present at the scene of the commission of the crime, without disapproving or opposing it, is evidence from which, in connection with other circumstances, it is possible for the jury to infer that he/she assented thereto, lent to it his/her countenance and approval and was thereby aiding the same. <u>It depends upon the totality of the circumstances as those circumstances appear from the evidence</u>.[2]

---

[2] <u>State v. Randolph</u>, 228 N.J. 566, 590-91 (2017).

A-0216-19

[Model Jury Charges (Criminal), "Liability for Another's Conduct" (N.J.S.A. 2C:2-6) (rev. July 7, 2021) (emphases added).]

Here, the judge did not consider the totality of the circumstances to hold defendant legally liable for the conduct of her friend. Defendant testified the person who actually threw the eggs at plaintiff's car was motivated by the anger she felt against her former boyfriend, not by anything connected to plaintiff. Despite this evidence, the judge nevertheless found defendant culpable based only "on the text messages which shows that she inculpated herself by suggesting she was there." Although further inferences could potentially be drawn from the parties' testimony and the circumstances surrounding the incident, the judge did not place these potential findings on the record and our review is thus limited accordingly. In this light, even under the preponderance of the evidence standard applicable in this civil proceeding, N.J.S.A. 2C:25-29(a), defendant's mere presence at the scene, without more connecting her to the alleged criminal mischief, is legally insufficient to find her liable for her companion's actions. Randolph, 228 N.J. at 591-92.

Independent of this error, the record also shows plaintiff did not present sufficient evidence to prove defendant committed the predicate offense of

11

criminal mischief as a matter of law.  In determining whether plaintiff presented sufficient evidence to satisfy this burden of proof,

> [t]he court <u>shall consider</u> but not be limited to the following factors:
>
> (1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;
>
> (2) The existence of immediate danger to person or property;
>
> (3) The financial circumstances of the plaintiff and defendant;
>
> (4) The best interests of the victim and any child;
>
> (5) In determining custody and parenting time the protection of the victim's safety; and
>
> (6) The existence of a verifiable order of protection from another jurisdiction.
>
> [N.J.S.A. 2C:25-29(a) (emphasis added).]

The judge's findings and conclusion that defendant committed the predicate act of criminal mischief did not consider the relevant statutory factors codified in N.J.S.A. 2C:25-29(a).  Although factors (4), (5), and (6) are obviously not relevant here, factors (1), (2), and (3) clearly are.  The Model Criminal Jury Charge approved by the Supreme Court with respect to the offense of criminal mischief defines "damage to tangible property" to mean "to cause a

loss, injury or deterioration that reduces the value or usefulness of something."

Model Jury Charges (Criminal), "Criminal Mischief – Purposeful or Knowing Damage to Tangible Property N.J.S.A. 2C:17-3a(1)" (rev. May 16, 2005).

In this case, plaintiff did not present any evidence that the value of his car was reduced or its usefulness diminished in any way by being hit with eggs. The judge's failure to make specific findings related to these mandatory factors renders the issuance of the FRO unsustainable as a matter of law.

Furthermore, in Silver v. Silver, this court adopted a two-prong analytical paradigm to determine whether the issuance of an FRO is warranted. As our colleague, Judge Robert Fall, explained:

> We view the task of a judge considering a domestic violence complaint, where the jurisdictional requirements have otherwise been met, to be two-fold.
>
> First, the judge must determine whether the plaintiff has proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19a has occurred.
>
> . . . .
>
> The second inquiry, upon a finding of the commission of a predicate act of domestic violence, is whether the court should enter a restraining order that provides protection for the victim.
>
> [Silver, 387 N.J. Super. at 125-26.]

13

The absence of this critically important analysis also renders the issuance of an FRO a nullity.

Finally, we cannot conclude our analysis without addressing the way the judge conducted this FRO hearing. Our Supreme Court has made clear that "'[t]rial judges are given wide discretion in exercising control over their courtrooms' and have 'the ultimate responsibility of conducting adjudicative proceedings in a manner that complies with required formality in the taking of evidence and the rendering of findings.'" N.J. Div. of Child. Prot. & Permanency v. A.B., 231 N.J. 354, 366 (2017), (quoting N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 264 (App. Div. 2002)). Here, the record shows the judge conducted this hearing in complete disregard of the rules of evidence and in violation of basic principles of courtroom management.

The judge's decision to read into the record the parties' electronic messages, taken directly from plaintiff's cell phone, ignored a trial judge's responsibility "to exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence . . . ." N.J.R.E. 611(a); see also R. 1:2-3. This ad hoc, disorganized manner employed by the judge throughout these proceedings made it extremely difficult, if not nearly impossible, for this court to assess the probative value of this electronic conversation.

14

"Fundamentally, due process requires an opportunity to be heard at a meaningful time and in a meaningful manner." Doe v. Poritz, 142 N.J. 1, 106 (1995).

The protection of victims of domestic violence is of paramount importance. N.J.S.A. 2C:25-18. However, we are also committed to ensuring the serious legal ramifications[3] flowing from being found guilty of committing a domestic violence offense are supported by competent evidence presented in a proceeding adhering to all the substantive and procedural due process protections associated with a fair trial. D.N. v. K.M., 429 N.J. Super. at 606. Distilled to their essence, the allegations plaintiff made against defendant do not rise to the level of a domestic violence act. See Corrente v. Corrente, 281 N.J. Super. 243, 250 (App. Div. 1995). The absence of competent evidence coupled with the Family Part's failure to adhere to rudimentary principles of court management and decorum compelled us to reach this legal conclusion.

The decision of the Family Part is reversed and the Final Restraining Order is vacated.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[3] See Franklin v. Sloskey, 385 N.J. Super. 534, 541 (App. Div. 2006).

A-0216-19